UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                         Case No. 18-CR-44

CRAIG E. HILBORN,

    Defendant.

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney, and Rebecca L. Taibleson and Stephen A. Ingraham, Assistant United States Attorneys, hereby files its sentencing memorandum.

**I.    Introduction**

For more than a decade, attorney Craig E. Hilborn participated in a fraudulent billing scheme that cost his victim, and purported client, millions upon millions of dollars. PSR ¶12. He was a sophisticated actor who abused the trust inherent in the attorney-client relationship. He has now admitted to his wrongdoing and has repaid the money he stole. *Id.* at ¶¶ 14, 15. Nonetheless, a substantial sentence is warranted here. For the reasons detailed below, the United States seeks a sentence of 27 months' imprisonment and a fine of $78,246.

1

## II. Argument

The legal standards governing Hilborn's sentence are well established. This Court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007):

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed–
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
> (4) the advisory guideline range;
> (5) any pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities; and
> (7) the need to provide restitution to any victims of the offense.

In the Government's view, the nature and circumstances of the offense, the need to provide restitution, the advisory Sentencing Guidelines, and the kinds of sentences available are particularly important here.

### A. The Nature and Circumstances of Hilborn's Offense

In 2000, Craig Hilborn was the principal of a small personal-injury and products-liability plaintiffs firm in Birmingham, Michigan, an upscale suburb of Detroit. PSR ¶8. Hilborn had been out of law school for ten years, and he became principal of his own firm by purchasing his father's interest therein. As reported in the PSR, Hilborn generally made over $200,000 per year at his firm. *Id.* at ¶69. Common sense tells us

2

Case 2:18-cr-00044-JPS    Filed 06/21/18    Page 2 of 7    Document 42

that countless attorneys would have been happy to trade places with him.

Hilborn, however, was evidently unsatisfied by the revenues generated by his firm's actual legal work. When his law school friend (and now co-defendant) Scott Hess reached out to him to propose what was, effectively, an embezzlement scheme from Hess's employer, Hilborn agreed to participate. *Id.* at ¶9. Together, Hess and Hilborn agreed to defraud Hess's employer ("Company A") by "billing" it, on Hilborn's behalf, for legal work actually done by Hess, or by no one at all. *Id.* at ¶¶9-10. Once Company A paid those "bills" to Hilborn's law firm, Hess and Hilborn split the proceeds; Hess received about 2/3, and Hilborn about 1/3. *Id.* at ¶9. That division of proceeds reflected Hess's larger role in the scheme: Hess was the one who generated the fake "bills," who approved them on behalf of Company A, and who caused them to be paid to Hilborn's law firm. *Id.* at ¶¶10-11. Hilborn provided his law firm's letterhead for the invoices but never bothered to review them, apparently content to simply receive regular, sizeable payments from Company A. *Id.* at ¶11. Hilborn knew, however, that the "invoices" reflected work that his firm had not, and could not, do for Company A. *Id.* at ¶9. When Hilborn received a payment from Company A, he promptly cut a check to Hess, marking the check "referral fees" and mailing it to Hess's home address.

Hilborn and Hess participated in this scheme for 15 years. *Id.* at ¶12. They stopped only when Company A discovered the embezzlement. *Id.* at ¶14. Over the course of those 15 years, Hilborn and Hess managed to steal nearly $4.5 million from Company A. *Id.* at ¶12. The money stolen from Company A was a huge part of

3

Hilborn's law firm's revenue. In 2015, for example, the PSR indicates that Hilborn's business tax returns showed gross receipts of $3,809,453 with a business income of $503,945. *Id.* at ¶69. That same year, Hilborn and Hess "billed" Company A for well over $1,000,000 in legal work that Hilborn did not do. Unsurprisingly, in 2016 (after being caught), Hilborn's business tax returns showed much lower gross receipts and business income. *Id.*

Hilborn kept nearly $1.5 million of the money stolen from Company A, sending the rest back to Hess. *Id.* at ¶12. Although the United States has not been able to trace Hilborn's fraud proceeds through his business accounts to particular assets, it is clear that Hilborn enjoyed a very comfortable lifestyle; he resides in a home worth over $1,000,000 and drives a fully paid-off Audi. *Id.* at ¶¶52, 72. Hilborn has now ceded many of his assets to his wife as part of their now-pending divorce, although he continues to enjoy some of their benefits (for example, he still lives in his home). *Id.* at ¶¶49, 73.

B.  **Acceptance of Responsibility and Restitution**

When Company A discovered the fraud scheme, Hilborn admitted his wrongdoing to (actual) Company A attorneys. He did not make any restitution payments at the time. When the United States initiated this criminal case, however, Hilborn cooperated immediately. Through his attorney, Hilborn waived indictment, pleaded guilty, and agreed to pay back his full share of the fraud scheme to Company A (approximately $1.5 million). *Id.* at ¶¶2, 5. Hilborn refused to submit a Financial Disclosure Statement to the United States Attorney's Office, but he did make full

4

restitution to Company A on April 2, 2018 – the same day he pleaded guilty. *Id.* at ¶15. As mentioned above, the United States was not able to trace the proceeds of the scheme through Hilborn's law firm accounts to any specific assets; as a result, the United States has not sought to forfeit any of the assets that Hilborn may have purchased using Company A's embezzled money.

In light of Hilborn's full restitution payment to Company A, the United States is requesting a sentence below the applicable Sentencing Guidelines range here.

### C. The Advisory Sentencing Guidelines

As reflected in the Pre-Sentence Report, the advisory Sentencing Guidelines range applicable to Hilborn is 41-51 months' imprisonment. *Id.* at ¶78. The parties have no dispute about that range. In the Government's view, Hilborn's substantial efforts to make Company A whole warrant a sentence below that range. The sentence requested herein, 27 months' imprisonment, is approximately 35% lower than the bottom of Hilborn's Guidelines range. The United States requested a comparable departure for Hilborn's co-defendant, Hess. R. 33 at 5-6. Hilborn recommends a sentence of one year and one day. R. 38 at 6, 12. The United States, however, believes that its recommendation is more appropriate, and particularly so in comparison to the 32-month sentence this Court imposed on Hilborn's co-defendant Scott C. Hess. R. 36.

The Sentencing Guidelines also state that "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2. Hilborn is able to pay a fine, and a

5

fine would be appropriate here given that Hilborn has not forfeited any of the investment proceeds he earned or assets he obtained with Company A's money over the course of 15 years. The Guidelines provide for a fine in the range of $7,500 - $75,000. U.S.S.G. § 5E1.2(c)(3) (Nov. 2014 version). The Guidelines also state that in imposing a fine, the court should consider the expected costs to the Government of any term incarceration. U.S.S.G. § 5E1.2(d)(7). According to the PSR, the most recent advisory from the Administrative Office of the U.S. Courts suggests a monthly cost of $2,898.00 to be used for imprisonment. PSR at ¶87. The cost of imprisoning Hilborn for 27 months is thus approximately $78,246. The United States therefore seeks a fine of $78,246. Although that amount is slightly above the Guidelines fine range, it reflects the high costs of incarceration today, it is a sum that Hilborn can afford to pay, and it is well below the statutory maximum fine of $500,000.

**III.    Conclusion**

Craig E. Hilborn committed a serious and very long-term crime, motivated entirely by greed. He has now cooperated in efforts to accept responsibility and repay his victim. In these circumstances, a sentence of 27 months' imprisonment and a fine of $78,246 is sufficient, but not greater than necessary, to achieve the ends of sentencing.

Dated at Milwaukee, Wisconsin this 21st day of June, 2018.

                                      Respectfully submitted,
                                      MATTHEW D. KRUEGER
                                      United States Attorney

By:    */s/ Rebecca L. Taibleson*
        */s/ Stephen A. Ingraham*
        Rebecca L. Taibleson (Bar No. 1104085)
        Stephen A. Ingraham (WI Bar No. 1009890)
        Assistant United States Attorneys
        United States Attorney's Office
        Eastern District of Wisconsin
        517 East Wisconsin Avenue
        Milwaukee, Wisconsin 53202
        Telephone: (414) 297-1630
        Fax: (414) 297-1738
        Email: rebecca.taibleson@usdoj.gov
        Email:  stephen.ingraham@usdoj.gov